UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL T. CORBIN, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | * Civil Action No. 18-cv-12060-ADB |
| | * |
| STEVEN KENNEWAY, | * |
| | * |
| Respondent. | * |

<u>MEMORANDUM AND ORDER</u>

BURROUGHS, D.J.

        In May 2013, a Suffolk County jury convicted Petitioner Michael T. Corbin of first

degree murder and a number of firearm offenses.  He was subsequently sentenced to life in

prison without the possibility of parole.  On October 3, 2018, after the Massachusetts Supreme

Judicial Court ("SJC") affirmed his conviction and the United States Supreme Court denied his

petition for a writ of certiorari, Corbin petitioned Respondent Steven Kenneway ("Respondent")

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, [ECF No. 1], attacking his conviction

on multiple grounds, <u>see generally</u> [ECF No. 2].  For the reasons set forth below, Corbin's

petition, [ECF No. 1], is <u>DENIED</u>.

**I.     FACTUAL BACKGROUND**

        The SJC provided an account of the facts as the jury could have found them,[1] which is

reproduced in relevant part below (including the footnotes from the opinion, although the

numbers do not match the original):

_____

[1] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody
pursuant to the judgment of a State court, a determination of a factual issue made by a State court

On July 25, 2011, a couple who lived on the second floor of an apartment building on Hyde Park Avenue, in the Hyde Park section of Boston, awoke to the sound of gunshots at around 11:55 P.M.  They heard between six and eight gunshots that the woman believed came from an apartment below.  The couple looked out of their bedroom window, and saw six or seven men running out of the entrance to their building.  The woman telephoned 911 at 11:57 P.M.[2]

The men split up.  Some of them ran straight across Hyde Park Avenue.  At that moment, a passenger in a vehicle approaching the victim's apartment building saw three men run in front of her vehicle; one of the men carried what looked like a white pillow case.  The men got into a grey or silver sedan so quickly that a man's foot was hanging outside the vehicle as it sped away.  None of the witnesses was able to give more than a general description of the men, except that one man was heavyset;[3] the witnesses could only guess at the race or ethnicity of the men they observed.

At 12:41 A.M. on July 26, 2011, Boston police responded to the scene and were directed to the victim's apartment.  They found a large watch on the floor near the front entrance to the building.  [Billie Marie] Kee, dressed in a bloody shirt and underwear, was found lying face down on the floor just inside the apartment.  She had suffered four gunshot wounds and multiple stab wounds, and she was pronounced dead at the scene.  Kee's cause of death was gunshot wounds to the torso and injuries to the lungs, ribs, and spine.

[Kevin] Thomas[, Jr.], dressed in a T-shirt, shorts, and socks, was found in the front bedroom, lying on his back over a pile of clothing; his legs were bound at the ankles with black wire.  He had suffered seven gunshot wounds and four stab wounds to his body, and he was pronounced dead at the scene.  Thomas's cause of death was gunshot wounds to the torso and neck.

The victims' apartment had been ransacked.  Broken glass and blood were on the floor, clothes were strewn about, and the cabinets and drawers were open in the kitchen and bathroom.  There were no signs of forced entry; the front door was ajar, with the lock intact, and the back doors were locked from the inside.  Although the officers observed no "land line" telephone in the apartment, they did not recover

---

shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  This presumption applies with equal force to findings of fact by state trial and appellate courts.  RaShad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002).  The facts can be rebutted only with "clear and convincing evidence to the contrary."  28 U.S.C. § 2254(e)(1); RaShad, 300 F.3d at 35.

[2] This neighbor placed four cellular telephone calls to 911 that evening.  Only the calls placed at 11:57 P.M. and 12:41 A.M. are relevant here.

[3] Fulgiam's height and weight are listed on his State police fingerprint card as five feet, ten inches tall and 300 pounds.

any cellular telephones.  A curling iron with its cord cut and two knives with brownish-red stains were found near Kee's body.  The curling iron cord matched the wire that was used to bind Thomas's ankles.

In the front bedroom, in a tall bureau, officers found a packet of photographs, two of which depicted Thomas with [Earl] Fulgiam and Corbin, at Thomas's apartment, sitting on the couch in front of stacks of United States currency.  Near Thomas's body officers found a black backpack with what appeared to be a bag of marijuana inside.

On July 27, 2011, a subsequent search of the basement revealed two plastic bags of what appeared to be "crack" cocaine, and two digital scales.  Based on all of the evidence that the police officers had found during their investigation, they surmised that the assailants were likely known to the victims and that the murders were likely the result of a drug robbery.

In the front yard, officers recovered a loaded nine millimeter semiautomatic pistol with a magazine and a loaded .38 caliber silver revolver.  A diamond encrusted ring was found on Hyde Park Avenue.

John Golden, Thomas's best friend, testified that Thomas sold large amounts of marijuana and cocaine.  On the day of the murders, Golden saw approximately $5,000 in the bureau.  When Golden was shown the photograph depicting Thomas, Corbin, and Fulgiam with the bundles of cash, Golden estimated the amount to be between $12,000 and $13,000.  Police were able to determine the date of the photograph as May 11, 2011.  Golden also identified the watch and the ring that had been recovered as belonging to Thomas.  Golden described Thomas as being "paranoid," so much so that he insisted that even trusted friends call before coming to his apartment.

On July 29, 2011, a latent print from the nine millimeter semiautomatic pistol recovered from the scene was "individualized," or matched, to Fulgiam.  Thirteen spent nine millimeter shell casings, eight spent nine millimeter bullets, and four bullet fragments were recovered from the scene and from the victims.  Analysis of the firearms revealed that the nine millimeter semiautomatic contained a magazine that held twenty rounds of ammunition; eight were recovered in the magazine.  All of the bullets, bullet fragments, and shell casings had been fired from the nine millimeter semiautomatic pistol.

A detective learned that the victims' cellular telephones had not been recovered, so he requested and obtained traces on both.  Thomas's cellular telephone records showed that a certain cellular telephone number was listed in Thomas's telephone records for July 25, 2011.  Police learned that this telephone had been stolen that afternoon between 4:30 P.M. and 5:30 P.M.  The owner told police that he did not recognize Thomas's cellular telephone number or the number later identified as Fulgiam's cellular telephone number, both of which were listed in his call detail

records for July 25, 2011.  The Commonwealth issued administrative subpoenas for Fulgiam's cellular telephone call detail records and for a cellular telephone number ending in 2898, which was later connected to Corbin.[4]   The police discovered that Corbin and Thomas had been in contact, via short message service messages (text messages), or telephone calls, several times on July 25, 2011. Fulgiam and Corbin also had been in telephonic contact that day.

On August 8, 2011, two detectives interviewed Fulgiam at his home.  At this time the police had not sought an arrest warrant for Fulgiam.  Fulgiam told the detectives that he and Thomas had known one another since the early to mid-2000s, and that he knew Thomas very well.  Fulgiam admitted that he and Thomas were in the drug business together and that he would meet with Thomas one or two times per month, at one of their homes to conduct business.  He estimated that it had been about one month since he had last met with Thomas, but could not remember whether it had been at his home or at Thomas's home.  He last communicated with Thomas via text message on July 17.  Fulgiam had Thomas's cellular telephone number, and he stated that he changed his own cellular telephone number two weeks prior[5] because a woman had been stalking him.  Fulgiam was not aware of Thomas having disputes with anyone and noted that Thomas had a lot more money than he did.  Fulgiam opined that whoever killed Thomas had to have been close to him.

The two detectives interviewed Corbin at his home on August 10, 2011.  At that time, he was not under arrest.  One of the detectives had previously been in telephonic contact with Corbin,[6] who agreed to meet with the detectives. Corbin told the detectives that he had known Thomas since Corbin was thirteen years old. Corbin was equivocal about when his last communication with Thomas occurred; he first said it had been a month prior, but later said it could have been weeks or days before Thomas was killed.  He stated that the last time he was in Thomas's apartment was on May 1, 2011, but that he had been in the apartment many times. Corbin mentioned that Thomas was not a showy guy, and that he had a watch and

---

[4] Fulgiam's call detail and subscriber information was originally obtained through an administrative subpoena, discussed infra, issued on August 4, 2011.  On August 16, 2011, additional administrative subpoenas issued for both Fulgiam and Corbin's subscriber and call detail information.  Both Fulgiam and Corbin's cellular telephone records information, including call detail information records, subscriber information, cell site location information (CSLI) and, for Corbin, the content of text messages, were subsequently obtained through a court order pursuant to 18 U.S.C. § 2703(d) (2006), also discussed infra.

[5] The murders occurred exactly two weeks before the day of Fulgiam's interview.

[6] Corbin's cellular telephone account was not listed in his name, nor did the address given match where Corbin was living at the time of his interview with police.  Corbin's cellular telephone service provider, Metro PCS, is an advance pay company which offers a plan providing thirty days of service for a monthly fee of forty dollars.  The company does not conduct a credit check or verify customer's identification information.

ring, but only wore them on the weekends.  He also noted that Thomas was a smart and careful person and that one had to inform Thomas before coming to his home. On September 14, 2011, police learned that fingerprint analysts had individualized to Corbin's right thumbprint a latent print found on the curling iron that had been recovered from the victim's home.  On October 27, 2011, pursuant to a search warrant, detectives seized Corbin's cellular telephone ending with the number 2898 (2898 number) and discovered photographs of Fulgiam, as well as both Fulgiam and Thomas's numbers programmed into the contact list.  That same day, the police obtained arrest warrants for Corbin and Fulgiam.

*     *     *

On August 15, 2011, after a review of Thomas's cellular telephone records, the Commonwealth sought and received a court order, pursuant to 18 U.S.C. § 2703(d) (2006) (§ 2703[d] order), for the historical cell site location information (CSLI)[7] and other cellular telephone account information for several cellular telephone numbers that were in contact with Thomas's cellular telephone on July 25, 2011, the day of the murder.

*     *     *

Using the § 2703(d) order issued on August 15, the Commonwealth obtained Corbin's cellular telephone subscriber and call detail information, CSLI, and text messages for the period from July 20 through July 30, 2011.

Commonwealth v. Fulgiam, 73 N.E.3d 798, 804–07, 809 (Mass. 2017).

## II.    PROCEDURAL BACKGROUND

In May 2013, Corbin was tried, along with his co-defendant Fulgiam, in Suffolk County Superior Court.  Fulgiam, 73 N.E.3d at 804.  The jury convicted Corbin of murder, armed robbery, carrying an unlicensed firearm, carrying a loaded firearm, and possession of a large capacity firearm, and he was sentenced to life without the possibility of parole.[8]  Id. at 804, 804

---

[7] "[CSLI] 'refers to a cellular telephone service record or records that contain information identifying the base station towers and sectors that receive transmissions from a [cellular] telephone.'"  Commonwealth v. Estabrook, 472 Mass. 852, 853 n.2, 38 N.E.3d 231 (2015), quoting Commonwealth v. Augustine, 467 Mass. 230, 231 n.1, 4 N.E.3d 846 (2014) (Augustine I), S.C., 470 Mass. 837, 26 N.E.3d 709 and 472 Mass. 448, 35 N.E.3d 688 (2015). "'Historical' CSLI refers to CSLI relating to and generated by cellular telephone use that has already occurred at the time of the order authorizing the disclosure of such data." Augustine I, supra.

[8] The Commonwealth dismissed the armed robbery and carrying a loaded firearm charges prior to sentencing.  Fulgiam, 73 N.E.3d at 804 n.3.

n.3.  He appealed his conviction to the SJC, which affirmed on May 5, 2017.[9]  See generally id.

In response to Corbin and Fulgiam's joint petition for rehearing, the SJC amended its opinion but

otherwise denied relief.  See generally id.  The United States Supreme Court denied their joint

petition for a writ of certiorari on October 10, 2017.  See Fulgian v. Massachusetts,[10] 138 S. Ct.

330.

On October 3, 2018, Corbin filed his petition for a writ of habeas corpus.  [ECF No. 1].

Respondent opposed on March 1, 2019, [ECF No. 18], and on April 23, 2019, Corbin replied,

[ECF No. 22].[11]

## III.   LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

To be deemed contrary to clearly established federal law, a state court decision must announce[] a rule of law that directly contradicts existing Supreme Court precedent or . . . reach[] a different result than the Supreme Court on materially indistinguishable facts.  An unreasonable application occurs when the state court

---

[9] Corbin's appeal was consolidated with that of his co-defendant, Fulgiam, who was also convicted of the same charges after their joint trial.

[10] The Supreme Court caption incorrectly reads "Fulgian" instead of "Fulgiam."

[11] Fulgiam filed a similar habeas petition, which Judge Woodlock denied on March 8, 2019.  See Fulgiam v. Kenneway, 364 F. Supp. 3d 93 (D. Mass. 2019); see also Fulgiam v. Kenneway, No. 19-1292, 2020 WL 7488125 (1st Cir. Apr. 13, 2020) (denying certificate of appealability).

identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case. Federal habeas relief only provides a remedy for instances in which a state court unreasonably *applies* [the Supreme] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.

These standards ensure that federal habeas relief will be granted only in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents. One consequence of this rule is that a federal court sitting in habeas jurisdiction may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous.

Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018) (alterations in original) (internal citations and quotation marks omitted).

With regard to whether a determination of the facts was unreasonable, the Supreme Court has noted that "[t]he term 'unreasonable' is no doubt difficult to define." Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000). "It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Id. "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Id. (second alteration in original) (quoting Rice v. Collins, 546 U.S. 333, 341–42 (2006)).

"If [§ 2254(d)'s] standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011). "This standard applies, however, only to a 'claim that was adjudicated on the merits in State court proceedings.'" Pike v. Guarino, 492 F.3d 61, 67 (1st Cir. 2007) (quoting 28 U.S.C. § 2254(d)). "If the federal claim was never addressed by the state court, federal review is de novo." Id. (citing Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001)). "When a federal claim has been presented to a state court and the state

court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99; see also Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."). To overcome the presumption of adjudication on the merits, the evidence must lead "very clearly to the conclusion that a federal claim was inadvertently overlooked in state court . . . ." Johnson, 568 U.S. at 303.

## IV. DISCUSSION

In his petition, Corbin advances multiple grounds for relief. Although there is some overlap, they fit into two broad categories: (1) violations of the Sixth Amendment's Confrontation Clause; and (2) instances of ineffective assistance of counsel. See generally [ECF No. 2; ECF No. 22].

### A. Confrontation Clause

Corbin asserts two separate violations of the Confrontation Clause. First, the Commonwealth should not have been permitted to introduce a fingerprint card, which it associated with Corbin. [ECF No. 2 at 21–38]. Second, the Commonwealth's fingerprint expert should not have been permitted to testify as to another expert's verification of her work. [Id. at 38–43]. Respondent maintains that neither alleged violation is a proper ground for habeas relief. See [ECF No. 18 at 12–24, 34–38].

#### 1. Fingerprint Card

At trial, the Commonwealth presented evidence that the latent fingerprint lifted from the barrel of the curling iron found near Kee's body matched the fingerprint from a ten-print card

that the Commonwealth associated with Corbin.[12]  Fulgiam, 73 N.E.3d at 815–16.  As a matter

of Massachusetts evidence law, the trial court admitted the ten-print card under the business

records exception to the rule against hearsay.  See id. at 816.  Corbin argues that the introduction

of the ten-print card at trial, without accompanying live testimony from the person providing the

fingerprints or the individual who took the fingerprints, was a violation of the Confrontation

Clause because the "statement of identity" on the card (i.e., "My name is ___ and these prints

belong to me") is testimonial, triggering the right to confrontation under the Supreme Court's

Confrontation Clause precedent.  [ECF No. 22 at 10–12].  Put slightly differently, Corbin

contests that the fingerprints on the ten-print card are his and maintains that the card's admission

as a business record without any live testimony as to the identity of the person whose fingerprints

are on the card prevented him from being able to meaningfully challenge the Commonwealth's

attribution of the fingerprints on the card to him.

      The SJC considered and rejected Corbin's Confrontation Clause argument on the merits.

See Fulgiam, 73 N.E.3d at 819 ("Last, the defendants argue that the admission of the ten-print

cards violated the right of confrontation as guaranteed by the Sixth Amendment to the United

States Constitution and art. 12 of the Massachusetts Declaration of Rights. We disagree.").[13]

---

[12] A "ten-print" card is a document including "the ten fingerprint impressions, the name of the
person who is being fingerprinted, typically a signature of that person, and other identifying
information, such as date of birth and address."  Fulgiam, 73 N.E.3d at 816.  Corbin's card was
created years before the case commenced, after his arrest for an unrelated incident, and, although
it was missing certain information that ordinarily would be included, such as the signatures of the
individual taking the fingerprints and the individual being fingerprinted, it did include Corbin's
name, aliases, date of birth, sex, race, place of birth, height, weight, eye and hair color, and
Social Security number.  Id. at 817 n.23.

[13] The SJC also upheld the trial court's conclusion that the ten-print card was properly admitted
pursuant to the Massachusetts business records exception to the rule against hearsay.  Fulgiam,
73 N.E.3d at 818.  This Court is "limited to deciding whether a conviction violated the
Constitution, laws, or treaties *of the United States*."  Estelle v. McGuire, 502 U.S. 62, 68 (1991)

Accordingly, the AEDPA's highly-deferential standard applies and the Court will grant Corbin habeas relief on this ground only if the SJC's decision was contrary to, or an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

The Supreme Court has not squarely addressed whether the introduction of a fingerprint card, without accompanying testimony from either the person who took the fingerprints or the person whose fingerprints were taken, violates the Confrontation Clause.  Accordingly, to prevail, Corbin must demonstrate that the Supreme Court has "articulate[d] legal principles that clearly extend" to the fingerprint card context, Jenkins v. Bergeron, 824 F.3d 148, 153 (1st Cir. 2016) (internal quotation marks and citations omitted), and that the SJC's decision here runs contrary to, or is an unreasonable application of, those principles, id. at 152.  He has not met his burden.

Under the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall . . . be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause, however, bars the admission only of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination," Crawford v. Washington, 541 U.S. 36, 53–54 (2004), because only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause."  Davis v. Washington, 547 U.S. 813, 821 (2006) (citing Crawford, 541 U.S. at 51).  If a statement is non-testimonial, the Confrontation Clause is inapplicable.  United States v. Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir. 2010); see also Davis, 547 U.S. at 821

_____

(emphasis added) (citing 28 U.S.C. § 2241).  Therefore, the Court may not consider Corbin's arguments to the extent that he challenges the SJC's conclusions regarding the Massachusetts rules of evidence.  See, e.g., [ECF No. 2 at 26 ("The State Court's Determination that the Ten Print Cards Were Business Records Was an Unreasonable Interpretation of the Evidence and Not Supported By the Record.")].

("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").  There is no bright-line rule, however, for determining whether a given statement is testimonial.  In Crawford, the Supreme Court declined to "spell out a comprehensive definition of 'testimonial.'"  541 U.S. at 68.  Instead, it merely held that "prior testimony at a preliminary hearing, before a grand jury, or at a former trial" and "police interrogations" were testimonial. Id.  In Davis, the court again declined to "produce an exhaustive classification of all conceivable statements" in favor of issuing a narrow holding that statements made during the course of police interrogations are "testimonial when the circumstances objectively indicate that there is no such ongoing emergency."  547 U.S. at 822.

Since Crawford and Davis, the Supreme Court has offered some guidance, but still has not established a definitive, generally-applicable test.  Compare Bullcoming v. New Mexico, 564 U.S. 647, 659 n.6 (2011) ("To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" (alterations in original) (quoting Davis, 547 U.S. at 822)), and Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because— having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."), with Williams v. Illinois, 567 U.S. 50, 86 (2012) (Breyer, J., concurring) (noting that lower courts would benefit from a "generally applicable answer" to the question of how the Confrontation Clause applies to a "panoply of crime laboratory reports and underlying technical statements").

In arguing that the SJC's decision was an unreasonable application of Supreme Court precedent, Corbin relies primarily on Melendez-Diaz and Bullcoming, see [ECF No. 2 at 21–33], maintaining that because the ten-print card was fed into a fingerprint database used to aid the police in criminal investigations, its primary purpose was to prove the guilt of criminal defendants, thereby implicating the Confrontation Clause.  [Id. at 23–24; ECF No. 22 at 14–15].  His argument is unavailing.  Melendez-Diaz and Bullcoming are factually distinguishable and their application to Corbin's case is far from clear.

In Melendez-Diaz, the Supreme Court held that an affidavit "reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" was testimonial for Confrontation Clause purposes.  557 U.S. at 307, 310.  There, the affidavit was prepared specifically for that particular prosecution, a fact which the document itself noted, and the statement contained therein (i.e., that the substance found in the defendant's possession was cocaine) was "the precise testimony the analysts would be expected to provide if called at trial."  Id. at 310–11.  In sum, the prosecution sought to substitute a written affidavit for live, in-person testimony regarding an essential element of the criminal offense.  Id.

In Bullcoming, the Supreme Court held that the defendant was entitled to confront the analyst who actually certified a forensic report stating that the defendant's blood alcohol level was higher than the legal limit notwithstanding the fact that another analyst from the same lab did testify.  564 U.S. at 651–52.  As with Melendez-Diaz, in Bullcoming, the statement at issue was germane to a specific element of the charged offense and the report was prepared in anticipation of, and specifically for, the prosecution.  See id. at 664–65.  Here, Corbin's ten-print card was created years before he was charged or tried for the murders of Kee and Thomas.  Fulgiam, 73 N.E.3d at 816.  Moreover, there was unrebutted testimony that the card was created

in the ordinary course of business, not for use at Corbin's trial.  Id. at 819, 817 n.24.  While police routinely fingerprint individuals as an administrative matter, without an eye towards a specific criminal prosecution, they do not routinely test substances for drugs or measure blood alcohol levels in the absence of a criminal prosecution.

Given these material factual differences, Melendez-Diaz and Bullcoming do not articulate legal principles that clearly lead to the conclusion that the admission of the ten-print card violated the Confrontation Clause.  See Jenkins, 824 F.3d at 153.  To the contrary, multiple U.S. courts of appeals have held that the introduction of fingerprint cards similar to the one at issue here does not violate the Sixth Amendment.  See, e.g., United States v. Williams, 720 F.3d 674, 698 (8th Cir. 2013) (finding no Confrontation Clause issue where "fingerprint cards were created as part of a routine booking procedure and not in anticipation of litigation" notwithstanding the fact that the defendant disputed that he had provided the prints on the card); United States v. Dale, 494 F. App'x 317, 318 (4th Cir. 2012) (finding that fingerprint card was non-testimonial); United States v. Diaz-Lopez, 403 F. App'x 199, 202 (9th Cir. 2010) (same).  If anything, existing Supreme Court precedent suggests that admission of fingerprint cards does not implicate the Confrontation Clause.

In the absence of clear and applicable Supreme Court case law, "fairminded jurists" could disagree as to the correctness of the SJC's decision, Richter, 562 U.S. at 102, and therefore the Court cannot find that the SJC's decision was contrary to, or an unreasonable application of, clearly established federal law.[14]  Likely v. Ruane, 642 F.3d 99, 102 (1st Cir. 2011) ("If the

---

[14] As noted above, once a court determines that a statement is non-testimonial, the only bar to its admission is the rule against hearsay.  Davis, 547 U.S. at 821 ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").  Because the SJC's determination that the fingerprint card was non-testimonial was not contrary to, or an

federal law is not clearly established by the United States Supreme Court, then per force the state court decision cannot be either contrary to or an unreasonable application of clearly established federal law."); <u>see also</u> <u>White v. Woodall</u>, 572 U.S. 415, 426 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.").

2.   <u>Expert Testimony</u>

At trial, the Commonwealth's fingerprint expert, Ms. Tolan, testified regarding the ACE-V methodology for fingerprint individualization,[15] which she used to match the latent fingerprint on the curling iron to a print on Corbin's ten-print card.  <u>Fulgiam</u>, 73 N.E.3d at 821. The parties do not contest the content of Ms. Tolan's relevant testimony, which was as follows:

> Q. Ms. Tolan, I'm [sic] want to show you this board and ask you if you recognize what's depicted on this Board?
> A. Well, it's an overall photograph of the curling iron at the crime scene as well as the latent location photograph of Latent 18A, a picture of latent 18A, and then the known impressions of Michael Corbin.
> Q. And what about relative to the lower right-hand corner, what appears down there?
> A. The known ten finger impressions of Michael Corbin.
> Q. And does that include the right thumb?
> A. Yes.
> Q. And whose initials appear on the box containing the known impression of Michael Corbin's right thumb?
> A.  It would be my initials as well as the verifier, Ioan Truta.
>                              *       *       *
> Q.  Prior to generating a report, were your findings reviewed by anybody or after you generated the report?
> A. Before.

---

unreasonable application of, clearly established federal law, this Court is without jurisdiction to review the SJC's decision that the card was admissible as a business record as that decision was a matter of Massachusetts law.  <u>See</u> <u>Estelle</u>, 502 U.S. at 67–68.

[15] ACE-V stands for "analysis, comparison, evaluation, and verification."  <u>See</u> <u>United States v. Casanova</u>, 886 F.3d 55, 61 (1st Cir. 2018).

> Q. And who were your findings reviewed by?
> A. Ioan Truta.
> Q. Okay.  And as far as Mr. Truta reviewing the individualization, was that confirmed by Mr. Truta?
> A. Yes.

[ECF No. 2 at 39–40 (emphasis omitted); ECF No. 18 at 35].  Before Ms. Tolan testified as to her ACE-V evaluation of Fulgiam's fingerprints, Fulgiam's counsel objected to any testimony indicating that Mr. Truta "verified" the fingerprint analysis, and the trial court sustained the objection.  Fulgiam, 73 N.E.3d at 821 n.27.  On appeal, both Corbin and Fulgiam argued that the trial court erred in allowing Ms. Tolan to testify that Mr. Truta reviewed her work, id. at 821, but the SJC rejected their arguments, holding that although "[e]xpert testimony as to the opinions of a second, nontestifying expert constitutes inadmissible hearsay," no such testimony had been admitted because the trial court "allowed the analyst's testimony that the other analyst 'reviewed' her work, but did not allow testimony that the second analyst verified her work."  Id.

Now, Corbin asserts that the SJC ignored important differences between Ms. Tolan's testimony regarding his fingerprints and her testimony regarding Fulgiam's fingerprints.  [ECF No. 22 at 21; ECF No. 2 at 40–42].  Specifically, Corbin points to Ms. Tolan's testimony identifying Mr. Truta as "the verifier" and her answer "yes" to the question, "[a]nd as far as Mr. Truta reviewing the individualization, was that confirmed by Mr. Truta?"  [ECF No. 2 at 39–40].

Corbin presented his Confrontation Clause argument to the SJC.  See [SA 78 (Corbin's SJC Brief at 50) ("Since Mr. Truta's opinion was in effect, an out-of-court testimonial statement, it should not have been allowed into evidence, and its introduction violated Mr. Corbin's rights under the 6th Amendment and Article 12 of the Massachusetts Declaration of Rights.")].[16]

---

[16] The Court will cite to pages in Respondent's Supplemental Answer, which was filed manually, see [ECF No. 10 (Notice of Filing with Clerk's Office)], as "SA _."

Although the SJC did not explicitly mention the Confrontation Clause in reaching its conclusion, instead finding that there was no hearsay, the Court presumes that the SJC rejected the argument on the merits.[17]  See Richter, 562 U.S. at 99.  Accordingly, the AEDPA's highly-deferential standard applies and the Court will grant Corbin habeas relief only if the SJC's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In light of the evidence presented to it, the SJC's conclusion was not based on an unreasonable determination of the facts.  First, Ms. Tolan's testimony can be fairly interpreted as not containing any statement by Mr. Truta at all.  In other words, a reasonable interpretation of Ms. Tolan's testimony is that she stated only (1) that Mr. Truta's role was "verifier" and (2) that he performed his duty with respect to Ms. Tolan's matching of Corbin's fingerprint to the print on the curling iron.[18]  See Wood, 558 U.S. at 301 ("[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" (second alteration in original) (quoting Rice, 546 U.S. at 341–42)).  Second, having reasonably found that Ms. Tolan's testimony did not contain any statement by an out-of-court declarant, the SJC's rejection of Corbin's Confrontation Clause

---

[17] This presumption of adjudication on the merits is furthered bolstered by two facts.  First, the fact that the SJC had already analyzed the Confrontation Clause's applicability to the ten-print card suggests that it was fully aware of the Confrontation Clause issue.  Second, the case that the SJC primarily relied on, Commonwealth v. Whitaker, 951 N.E.2d 873 (Mass. 2011), included a holding that the admission of a non-testifying expert's conclusion "violates the defendant's right of confrontation," id. at 884, which again indicates that the SJC was aware of the potential Confrontation Clause implications of Ms. Tolan's testimony.

[18] The question "And as far as Mr. Truta reviewing the individualization, was that confirmed by Mr. Truta?" is confusing, in part, because the antecedent of "that" is unclear.  It does not necessarily communicate any opinion of Mr. Truta's.  Although one reasonable interpretation is that Ms. Tolan was saying that Mr. Truta verified (i.e., agreed with) her work, another reasonable interpretation is that Ms. Tolan was merely saying that Mr. Truta reviewed her work.

argument logically follows.  Thus, although the Court may have reached a different conclusion exercising its independent judgment, the SJC's decision was still objectively reasonable.  See Gomes v. Silva, 958 F.3d 12, 20 (1st Cir. 2020).

### B. Ineffective Assistance of Counsel

Corbin also advances ineffective assistance of counsel as a ground for habeas relief,[19] highlighting four alleged deficiencies with his trial counsel: (1) failing to file a suppression motion with respect to Corbin's text messages; (2) failing to object to Ms. Tolan's testimony regarding Mr. Truta's review of her fingerprint individualization; (3) failing to object to Ms. Tolan's alleged vouching for the authenticity of the fingerprint card; and (4) failing to demand a jury instruction regarding the ten-print card's admission as a business record.  See generally [ECF No. 2].

> The clearly established federal law governing ineffective assistance of counsel claims is the framework established in Strickland.  On direct review under Strickland, a criminal defendant must show that his attorney's performance was deficient and that he was prejudiced—deprived of a fair trial—as a result. Massachusetts applies a functional equivalent to the Strickland deficiency standard, which requires a serious failure by trial counsel, meaning a serious incompetency, inefficiency, or inattention that has likely deprived the defendant of an otherwise available, substantial ground of defence.  Reviewing courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and represents sound trial strategy.

> The Supreme Court has recently reinforced the doubly deferential standard that applies to a state prisoner's claims in a federal habeas petition that a state court has unreasonably applied the Strickland principles. . . .  The Court explicitly emphasized two points.  First, the pivotal question in a federal collateral attack under Strickland is not whether defense counsel's performance fell below Strickland's standard, but whether the state court's application of the Strickland standard was unreasonable, that is, whether fairminded jurists would all agree that the decision was unreasonable.  Second, the Strickland standard is a very general one, so that state courts have considerable leeway in applying it to individual cases.

---

[19] Corbin's current counsel, who also represented him before the SJC, did not represent him at trial.

Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011) (internal citations and quotation marks omitted).

Additionally, when considering ineffective assistance of counsel claims, courts must consider

defense counsel's performance holistically.  Richter, 562 U.S. at 111 ("And while in some

instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently

egregious and prejudicial,' it is difficult to establish ineffective assistance when counsel's overall

performance indicates active and capable advocacy." (quoting Murray v. Carrier, 477 U.S. 478,

496 (1986))); Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) ("Since '[t]here are countless

ways to provide effective assistance in any given case,' unless consideration is given to counsel's

overall performance, before and at trial, it will be 'all too easy for a court, examining counsel's

defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel

was unreasonable.'" (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984))).  Finally,

"[i]n measuring the quality of counsel's performance, 'the reasonableness of counsel's tactical or

strategic choices' is evaluated with 'a heavy measure of deference to counsel's judgments.'"

Lucien v. Spencer, 871 F.3d 117, 129 (1st Cir. 2017) (quoting Castillo v. Matesanz, 348 F.3d 1,

14 (1st Cir. 2003)).

    1.     Failure to Move to Suppress Text Messages

    At trial, the Commonwealth introduced text messages sent between Corbin's cellphone

and Thomas's on the day of the murders.[20]  Fulgiam, 73 N.E.3d at 810.  On appeal, Corbin

---

[20] Between 2:15 PM and 7:27 PM on the day of the murders, Corbin and Thomas exchanged the
following text messages:

        Thomas:     "What hapnd bro I need that"

                   "I need 2 c u like yesterday i have 2 get a whip manana n i def need
                   that bread i would appreciate if u didnt hold me up"

argued that the Commonwealth unlawfully obtained his text messages and that his trial counsel was constitutionally deficient because he failed to file a motion to suppress them.  Id. at 808. The SJC agreed with Corbin that a suppression motion likely would have succeeded because the Commonwealth did not obtain a search warrant, id. at 810, but nevertheless rejected Corbin's ineffective assistance of counsel claim because the admission of the text messages did not create a substantial likelihood of a miscarriage of justice and was unlikely to have influenced the jury's conclusion, id. at 814–15.[21]  The SJC reasoned as follows:

> Corbin's defense was that he was innocent and that Thomas, as a high level-drug dealer, was in a dangerous business.  Corbin claimed that many people knew Thomas was a drug dealer and, for that reason, he was a target for drug robbery. Corbin's argument that the content of his text messages was the only evidence from

| | |
|---|---|
| | "his is what i didnt want 2 happen we discussed this b4 bro straightn me first remember dnt make it bad bro" |
| Corbin: | "Bro u know i do what i can 2 get u first but i called u. I cant hold these n*****s up." |
| Thomas: | "n my bread u feel me wit out me it neva would have been there 2 flip anything" |
| | "U cant hold anyone up when its not there bread thats free money i should have mine off the top than play with urs not mine bro we talkd about this ur flip" |
| Corbin: | "I see u going through some thing cause we never kicked it like this. im going 2 put as much 2gether 4 u not in 2 long" |
| Thomas: | "Good look lol naw cause someone did somethng simular just cause i say im somewhre u cant assumd my schedule or do ur own thng thats all im tryna say talk" |
| | "2 you when u come bro" |

Fulgiam, 73 N.E.3d at 813 n.15.

[21] In assessing Corbin's ineffective assistance claim, the SJC applied the standard that Massachusetts courts apply when a defendant has been convicted of first degree murder. Fulgiam, 73 N.E.3d at 809.  Under that standard, which is more favorable to the defendant than the constitutional standard, courts assess whether the alleged lapse "created a substantial likelihood of a miscarriage of justice."  Id. (citation omitted). The court's focus is on the existence of an error and "whether such error was likely to have influenced the jury's conclusion."  Id. (internal quotation marks and citation omitted).

which the jury could find a motive and opportunity for Corbin to commit the murders is belied by the record. Much of the information about Thomas's status as a high level-drug dealer came in through other evidence.[22]

In addition, based on evidence wholly independent of the text messages, Corbin's involvement in the murders was not a close question. The discovery of Corbin's fingerprint on the barrel of the curling iron found near Kee's body was highly inculpatory, as was the evidence of Corbin's telephonic contact with Fulgiam, Thomas, and the stolen cellular telephone on the day of the murders. The inference that Corbin was in possession of the cellular telephone stolen a few hours before the murders, and that he used this telephone to contact Thomas on multiple occasions, including within two hours of the murders, also was highly inculpatory. The jury also heard evidence that Thomas, Corbin, and Fulgiam were involved in the drug business together and that the murders were likely connected to a drug robbery. Moreover, although we recognize that trial counsel was faced with the task of down-playing the impact of the text messages once they were admitted in evidence, he affirmatively used this content in his closing argument to establish that (1) Thomas had a significant amount of drugs and money in his apartment most of the time; (2) Thomas was a "tempting" target for robbery; and (3) the nature of Thomas's business was such that persons other than Corbin could have a motive to kill Thomas. Against the backdrop of this highly incriminating evidence, we cannot say that the jury's exposure to Corbin's text messages likely influenced the jury's verdict. Therefore, Corbin cannot meet his burden to establish that trial counsel's failure to file a motion to suppress the content of his text messages created a substantial likelihood of a miscarriage of justice.

Id. at 815.

Because the SJC considered and rejected Corbin's argument on the merits, the AEDPA's

doubly deferential standard for assessing ineffective assistance of counsel claims under § 2254

---

[22] Thomas's best friend testified that Thomas was selling "a few thousand dollars" worth of marijuana per week and approximately $4,000 or $5,000 worth of cocaine per week. Additionally, that friend testified that it was common in the drug business for a higher level dealer to supply drugs to "street-level" dealers for sale, and the jury heard evidence that Fulgiam admitted to being in the drug business with Thomas and that Thomas had a lot more money than Fulgiam.

applies.  Accordingly, Corbin bears the weighty burden of demonstrating that the SJC's

application of the Strickland principles was unreasonable.[23]  Jewett, 634 F.3d at 75.

Corbin asserts that the SJC unreasonably applied the Strickland standard in holding that

the introduction of the text messages did not influence the jury's verdict, maintaining that the

text messages were critical to establishing intent, motive, and presence at the crime scene and

that the other inculpatory evidence was deficient for various reasons.  [ECF No. 2 at 49–53].

The SJC thoughtfully considered the other evidence and concluded that the suppression of the

text messages was not likely to have influenced the jury's verdict.  Corbin's attempts to

challenge the SJC's conclusion are unsuccessful.  First, he argues that his latent fingerprint on

the curling iron would have been insufficient to support a conviction because he had been in

Thomas's apartment on multiple occasions and could have left the print on the iron on such an

occasion.  [Id. at 50].  This argument is undercut by the fact that the print was on the barrel, not

handle, of the curling iron, Fulgiam, 73 N.E.3d at 815, and Corbin's statement to the police that

he had not been at Thomas's apartment for months, id. at 806–07.

Second, he asserts that because he contests that the prints on the ten-print card were his

and that, in any event, his fingerprint expert disputed that the fingerprints matched, the "highly

contested fingerprint evidence, standing alone, was insufficient to establish" Corbin's presence at

the crime scene.  [ECF No. 2 at 51].  Even assuming that the jury faced "highly contested

fingerprint evidence," there was other evidence (such as the telephonic contact between Corbin,

---

[23] Because the standard that the SJC applied was more defendant-friendly than the constitutional
standard, by concluding that Corbin's counsel was not ineffective under that standard, it
necessarily concluded that Corbin's counsel met constitutional muster.

Fulgiam, and Thomas on the day of the murder)[24] supporting the conclusion that Corbin was at the crime scene.  More generally, Corbin attacks the correctness, not the reasonableness, of the SJC's decision.  See Richter, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard.").  Here, the SJC correctly identified the standard it was to apply and reasonably applied it to the facts at hand, noting with specificity the inculpatory evidence that existed separate and apart from the text messages.  See Fulgiam, 73 N.E.3d at 815.  Under these circumstances, the Court cannot conclude that "fairminded jurists" would all agree that the SJC's decision was unreasonable.  Jewett, 634 F.3d at 75 (quoting Richter, 562 U.S. at 101).  Accordingly, Corbin is not entitled to habeas relief based on his trial counsel's failure to file a suppression motion.

2.    Alleged Failures Related to Fingerprints

As discussed above, at trial, the Commonwealth introduced Corbin's ten-print card and expert testimony from Ms. Tolan matching the latent fingerprint on the curling iron to a print on the ten-print card.  Corbin argues that his trial counsel was constitutionally deficient for failing to object to Ms. Tolan's testimony allegedly indicating that Mr. Truta verified her fingerprint individualization or her alleged vouching for the authenticity of the ten-print card and also for not demanding a jury instruction regarding the ten-print card's admission as a business record. [ECF No. 2 at 34–37, 38 n.20].  The Court considers each in turn.

---

[24] Corbin also takes issue with the persuasiveness of the telephonic records, arguing, among other things, that Thomas spoke with multiple people on the day of the murder and that there was no concrete evidence linking Corbin, as opposed to one of the other six or seven men seen fleeing Thomas's apartment building, to the stolen phone.  [ECF No. 2 at 51–52].

a.      Mr. Truta's Verification

Corbin asserts that his trial counsel was constitutionally deficient for failing to object to Ms. Tolan's testimony allegedly indicating that Mr. Truta verified her fingerprint individualization.  [ECF No. 2 at 38–43].  Corbin presented this argument to the SJC, see [SA 77 (Corbin's SJC Brief at 49 n.38) ("To the extent he should have objected [to Ms. Tolan's testimony regarding verification], his conduct constituted ineffective assistance of counsel.")], but the SJC did not specifically address it, see generally Fulgiam, 73 N.E.3d 798.  Still, given the Richter presumption, the Court will apply the AEDPA's highly deferential standard.  Richter, 562 U.S. at 99.

Because the SJC reasonably concluded that Ms. Tolan's testimony contained no inadmissible hearsay, supra Section IV.A.2, its decision that Corbin's counsel was not constitutionally deficient for failing to object to that testimony was not an unreasonable application of the Strickland principles, see Jewett, 634 F.3d at 75.  Put slightly differently, because the SJC concluded that Ms. Tolan's testimony was unobjectionable, Corbin's counsel's failure to object to it was not ineffective.  See Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999) (noting that "counsel's performance was not deficient if he declined to pursue a futile tactic").

Even assuming the doubly deferential Strickland-AEDPA standard was not applicable, reviewing de novo, the Court would still conclude that Corbin's counsel was not constitutionally deficient for failing to object to this aspect of Ms. Tolan's testimony.  Corbin's counsel attempted to undermine Ms. Tolan's testimony in other ways.  Among other things, he: (1) objected to foundational questions regarding the creation or maintenance of the ten-print card and its admission into evidence; and (2) cross-examined Ms. Tolan about the lack of DNA evidence on the curling iron, the quality and match of the prints, the possibility that the latent

print had been left on the curling iron before the day of the murder, and the police's failure to

compare other latent prints found in the apartment to the prints of other individuals of interest.

[May 14, 2013 Trial Tr. at 62:19–63:18, 67:11–12, 108:7–18, 111:21–112:10, 113:2–19,

115:24–117:4][25]; see also Fulgiam, 73 N.E.3d at 821.  Corbin's counsel's "overall performance

indicates active and capable advocacy," Richter, 562 U.S. at 111, and the Court must afford

significant deference to his strategic choices, Lucien, 871 F.3d at 129.  Accordingly, his failure

to object to Ms. Tolan's ambiguous testimony, see supra note 18, did not render his

representation constitutionally deficient.

b. Ms. Tolan's Alleged Vouching

Corbin argues that his trial counsel was constitutionally deficient for failing to object to

Ms. Tolan's characterization of the prints from the ten-print card as Corbin's "known" prints.

[ECF No. 2 at 34–35].  That is, because Corbin contests that the prints on the ten-print card

bearing his name are actually his, he maintains that his counsel should have objected to

Ms. Tolan's testimony, which reinforced the association between the ten-print card and him.[26]

He presented this argument to the SJC, see [SA 72 (Corbin's SJC Brief at 44) ("Although trial

counsel vigorously challenged the validity of the 10 print card, he failed to object to the repeated

references by [Ms. Tolan] that the card contained the 'known' prints of Mr. Corbin . . . Counsel's

failure to object was so manifestly unreasonable as to be unprotected by the labels of trial

---

[25] Trial transcripts were filed in Respondent's Supplemental Answer but do not have "SA" pagination.  Accordingly, the Court will cite to the transcripts as "[Date] Trial Tr. at [Page: line]."

[26] Respondent counters that Ms. Tolan's references to a "known" print "were simply shorthanded ways to refer to the ten-print card in discussing her general analytical methodology."  [ECF No. 18 at 28].  The Court need not decide whether Ms. Tolan's testimony actually associates Corbin with the prints on the ten-print card because, even assuming it did, Corbin's argument fails.

strategy or trial tactics." (internal quotation marks omitted))], and the SJC held that because of its conclusion that the ten-print card was properly admitted under the business records exception, it did not need to "address Corbin's argument that trial counsel's failure to object to the validity of the ten-print card constituted ineffective assistance of counsel."  Fulgiam, 73 N.E.3d at 818 n.25. Although the SJC used the words "need not address," id., its statement is best viewed as an adjudication on the merits.  Having found that the ten-print card was admissible, the SJC logically concluded that any objection to the validity of the ten-print card would be meritless and Corbin's counsel could not therefore have been deficient for failing to make one.  For that reason, the doubly deferential Strickland-AEDPA standard applies.  Because the SJC concluded that the Massachusetts business record exception applied to the ten-print card, which associated the fingerprints on that card with Corbin, its decision that Corbin's counsel was not constitutionally deficient for failing to object to testimony further associating Corbin with those fingerprints was not an unreasonable application of the Strickland principles.  See Jewett, 634 F.3d at 75.

Even if the doubly deferential Strickland-AEPDA standard did not apply, reviewing *de novo*, the Court would still conclude that Corbin's counsel was not constitutionally deficient for failing to object to this aspect of Ms. Tolan's testimony.  As noted above, supra Section IV.B.2.a., Corbin's counsel sought to undercut Ms. Tolan's testimony in other ways. Additionally, the use of the word "known" was not as prejudicial as Corbin suggests given Ms. Tolan's admissions that she obtained Corbin's "known" print by feeding the latent print into the fingerprint database, [May 14, 2013 Trial Tr. at 61:18–62:2], and that she did not personally collect Fulgiam's ten-print card fingerprints, [id. at 145:25–146:8].  Moreover, as Respondent points out, Corbin's counsel may well have concluded that challenging the admissibility of the

ten-print card itself (on hearsay and Confrontation Clause grounds), as he did, was a more effective way of advancing his client's interests and that, once the card was admitted, quibbling with Ms. Tolan's word choice would be counterproductive and harm Corbin's credibility in the jury's eyes.  [ECF No. 18 at 29].  Because Corbin's counsel's "overall performance indicates active and capable advocacy," Richter, 562 U.S. at 111, and the Court must defer to his strategic choices, Lucien, 871 F.3d at 129, the Court concludes that his failure to object to Ms. Tolan's use of the word "known" did not result in constitutionally deficient counsel.

c.      Jury Instruction Regarding Business Records

Massachusetts law provides that "[w]hen [a business record] is admitted in a criminal proceeding all questions of fact which must be determined by the court as the basis for the admissibility of the evidence involved shall be submitted to the jury, if a jury trial is had for its final determination."  Mass. Gen. Laws ch. 233, § 78.  The four facts that a jury must find are that the record was (1) "made in good faith," (2) "in the regular course of business," (3) "before the beginning of the civil or criminal proceeding," and (4) that it was "the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter."  Id.  Corbin argues that his trial counsel was constitutionally deficient for failing to seek, or object to the omission of, a jury instruction putting the issue of whether the ten-print card was a business record before the jury, as contemplated by § 78.  [ECF No. 2 at 35–37].  He presented this argument to the SJC, see [SA 72–73 (Corbin's SJC Brief at 44–45) ("The jury was never instructed that they should determine whether the 10 print card was a legitimate business record . . . Counsel was ineffective for failing to seek such an instruction or objecting to its omission.")], but the SJC did not specifically address it, see generally Fulgiam, 73 N.E.3d 798.  Nevertheless, because of the Richter

26

presumption, the Court applies the AEDPA's highly-deferential standard.  Richter, 562 U.S. at 99.  Here, where the SJC concluded that the Massachusetts business records exception was applicable, its decision that Corbin's counsel was not constitutionally deficient for failing to seek a § 78 jury instruction was not an unreasonable application of the Strickland principles, see Jewett, 634 F.3d at 75.  In other words, because the exception was applicable, Corbin's defense was not prejudiced because the jury would have reached the same conclusion had the instruction been provided.[27]

Even assuming the doubly deferential Strickland-AEPDA standard was not applicable, reviewing *de novo*, the Court would still conclude that Corbin's counsel was not constitutionally deficient for failing to seek a § 78 jury instruction.  By the time the jury was charged, the ten-print card had already been admitted.  At that stage, Corbin's counsel may well have wanted to avoid unnecessarily drawing additional attention to how and when the card was created (i.e., when Corbin had been arrested).  Cf. Bly v. Nolan, 583 F. Supp. 2d 200, 204 (D. Mass. 2008) ("An attorney may opt not to object for a myriad of valid strategic reasons, such as to avoid emphasizing the damaging testimony in the eyes of the jury." (citing Commonwealth v. Gomes,

---

[27] Though Corbin challenges the testimony of the state trooper who testified about how ten-print cards are generally produced and maintained, see Fulgiam, 73 N.E.3d at 818, he does not appear to assert that any of four required elements were not proven at trial, see generally [ECF Nos. 2, 22].  Rather, Corbin states that a "Suffolk County jury might not have been so trusting of the police and might not have believed that the trooper was the keeper of the records where the trooper had never worked in the barracks that maintained the fingerprint records, there was no testimony that the trooper had provided the card to Tolan, and there was insufficient evidence that the card or its information was kept in a database that was under the State Police's exclusive control."  [ECF No. 22 at 18–19]; see also [ECF No. 2 at 36 (similar)].  As the SJC correctly recognized, this type of assertion goes to the weight not admissibility of the record.  Fulgiam, 73 N.E.3d at 818 ("We are also not persuaded by Corbin's argument that the ten-print cards were inadmissible because the Commonwealth presented testimony from a witness who did not actually take or maintain the ten-print cards.  Section 78 makes clear, as has this court, that the admissibility of a document under the business records exception does not turn on the personal knowledge of the record's preparer.").

822 N.E.2d 720, 725 (Mass. 2005))).  Moreover, during his closing argument, Corbin's trial

counsel chose to focus his energy on challenging the latent print on the curling iron rather than

the ten-print card, by disparaging the quality of the print, emphasizing that it could have been left

before the day of the murder, and encouraging the jury to reach its own conclusion as to whether

the latent print even matched the print on the ten-print card and to consider why it was not

compared to the known prints of other persons of interest.  [May 17, 2013 Trial Tr. at

23:23–28:18]; see United States v. Arias, 94 F. Supp. 3d 93, 114 (D. Mass. 2015) ("Furthermore,

counsel is not ineffective for failing to pursue every plausible avenue of defense." (citing

Knowles v. Mirzayance, 556 U.S. 111, 127 (2009))).  Finally, as mentioned above, the Court is

skeptical that the sought-after jury instruction would have made any difference given the

testimony regarding the ten-print card's creation.  Beyond speculation that a "Suffolk County

jury might not have been so trusting," [ECF No. 2 at 36], Corbin has presented no evidence

indicating that any of the four facts that must be proven under § 78 were legitimately disputed at

trial.  For this reason, Corbin has failed to demonstrate that the failure to seek a § 78 jury

instruction "prejudiced the defense."  Strickland, 466 U.S. at 687.

Again, Corbin's trial counsel's "overall performance indicates active and capable

advocacy," Richter, 562 U.S. at 111, and his strategic decisions therefore merit significant

deference, Lucien, 871 F.3d at 129.  Accordingly, his failure to seek a § 78 jury instruction did

not render his assistance constitutionally deficient.

V.    **CONCLUSION**

For the reasons noted above, Corbin's petition, [ECF No. 1], is DENIED.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner.  Rules Governing Section 2254 Cases, R. 11(a).  The Court declines to grant a certificate of appealability to Corbin.

**SO ORDERED.**

January 8, 2021                                          /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE